UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY; ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY; ALLSTATE INDEMNITY COMPANY; and ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY,<br><br>Plaintiffs,<br><br>v.<br><br>ORTIZ HEALTH AND REHAB CENTER, INC.; ALIGN TO SHINE CHIROPRACTIC LLC; ORLINE JOSEPH; and RICARDO BACALLAO, D.C.,<br><br>Defendants. | Civil Action No. _____<br><br><br>**Demand for Jury Trial** |

## **COMPLAINT**

Plaintiffs Allstate Insurance Company, Allstate Property and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Fire and Casualty Insurance Company (collectively, "Allstate" and/or "plaintiffs") hereby allege as follows.

## I.    **INTRODUCTION**

1.    This is a case about chiropractic clinics and their owners, managers, agents, and representatives who engaged in a scheme to defraud Allstate by

submitting and causing to be submitted false and fraudulent records, bills, and invoices through the U.S. Mail and faxes sent over state lines seeking to collect payment from Allstate for chiropractic services that were not actually performed, were unnecessary, were fraudulently billed, and were not lawfully rendered.

2.      The insurance fraud scheme perpetrated by the defendants was designed to, and did in fact, result in payments from Allstate to and on behalf of the defendants.

3.      All of the acts and omissions of the defendants, described throughout this Complaint, were undertaken intentionally.

4.      By this Complaint, and as detailed in each count set out below, Allstate brings this action for: (1) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962(c) and (d); (2) violations of the Florida RICO Act, Fla. Stat. § 772.103-104; (3) violations of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §§ 501.201-501.213; (4) common law fraud; (5) civil conspiracy; (6) aiding and abetting; and (7) unjust enrichment. Allstate also seeks declaratory relief that no previously-denied and pending insurance claims submitted to it by and on behalf of the defendants are compensable.

5.      As a result of the defendants' fraudulent acts, Allstate has paid hundreds of thousands of dollars to resolve insurance claims that were based on the false, fabricated, unlawful, and improper medical services at issue in this Complaint.

2

II.    **THE PARTIES**

A.    P<small>LAINTIFFS</small>

6.    Allstate Insurance Company, Allstate Property and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Fire and Casualty Insurance Company are each duly organized and existing under the laws of the State of Illinois.

7.    Allstate Insurance Company, Allstate Property and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Fire and Casualty Insurance Company each have their respective principal place of business in Northbrook, Illinois.

8.    At all times relevant to the allegations contained in this Complaint, the plaintiffs were authorized to conduct business in the State of Florida.

B.    D<small>EFENDANTS</small>

1.    **Ortiz Health and Rehab Center, Inc.**

9.    Defendant Ortiz Health and Rehab Center, Inc. ("Ortiz Health") was incorporated under the laws of the State of Florida and had its principal place of business in Kissimmee, Florida.

10.    At all relevant times, Ortiz Health was operated and conducted by defendants Orline (sometimes spelled Orlene) Joseph ("Joseph") and Ricardo Bacallao, D.C. ("Bacallao").

11.    Ortiz Health billed Allstate for services not rendered, that were unnecessary (to the extent they were rendered at all), and that were unlawful in relation to several Allstate insureds and claimants, including the patients identified in Exhibit 1.

## 2.    **Align to Shine Chiropractic LLC**

12.    Defendant Align to Shine Chiropractic LLC ("Align") is organized under the laws of the State of Florida.

13.    As detailed below, Align has falsely claimed that its member is defendant Bacallao, who is a resident and citizen of the State of Florida, but in reality its member is defendant Joseph, who is a resident and citizen of the State of Florida.

14.    At all relevant times, Align was operated and conducted by defendants Ortiz Health, Joseph, and Bacallao.

15.    Align billed Allstate for services not rendered, that were unnecessary (to the extent they were rendered at all), and that were unlawful in relation to several Allstate insureds and claimants, including the patients identified in Exhibit 2.

## 3.    **Orline Joseph**

16.    Defendant Orline Joseph is a resident and citizen of the State of Florida.

17.    At all times relevant to this Complaint, Joseph owned and controlled defendants Ortiz Health and Align.

### 4.    **Ricardo Bacallao, D.C.**

18.    Defendant Ricardo Bacallao, D.C. is a resident and citizen of the State of Florida.

19.    At all times relevant to this Complaint, Bacallao operated and controlled defendants Ortiz Health and Align.

## III.    **JURISDICTION AND VENUE**

20.    Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over this action on the basis of the claims brought by the plaintiffs under 18 U.S.C. § 1961, *et seq.* because they arise under the laws of the United States.

21.    Pursuant to 28 U.S.C. § 1332, this Court also has jurisdiction over this action because the amount in controversy, exclusive of interest and costs, exceeds $75,000 against each defendant and because it is between citizens of different states.

22.    Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

23.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because the majority of the acts at issue in this Complaint were carried out within the Middle District of Florida.

IV.    **BACKGROUND ON THE DEFENDANTS AND THEIR SCHEME**

24.    The defendants used the RICO enterprises identified herein – Ortiz Health and Align – to bill Allstate for purported chiropractic services that were not actually provided, were not necessary, were unlawful, and were fraudulently billed.

25.    Once patients began treatment with Ortiz Health or Align (the "defendant clinics"), the defendants implemented a predetermined treatment protocol that included excessive and unnecessary chiropractic services that were billed by the defendant clinics and their associates.

26.    The defendants invariably arranged for patients to undergo unnecessary and excessive diagnostic imaging and emergency medical condition ("EMC") evaluations to create the appearance of support for continued billing of chiropractic treatment that was not rendered, was not medically necessary, was unlawful, and was fraudulently billed.

27.    The majority of the bills and records at issue in this Complaint were mailed and faxed directly to Allstate by the defendants in order to induce payment of first-party medical benefits pursuant to the Florida Motor Vehicle No-Fault Law, Fla. Stat. § 627.730, *et seq*.

28.    Other bills and records were provided by the defendants to their personal injury attorney associates with the knowledge, understanding, and intention

6

that they would then be submitted to Allstate as a component of insurance claims and demands.

29.     In these instances, the defendants' improper bills and records were intentionally used to create the false appearance of significant injury to increase the perceived value of claims and induce Allstate into making payments to resolve such claims.

30.     The defendants' bills and records were designed to be, and in fact were, a substantial factor inducing Allstate to make payments that it would not have but for the wrongful bills by the defendants.

31.     The defendants also intentionally concealed the true ownership of the defendant clinics.

32.     As detailed below, defendant Joseph hired chiropractors to appear as though they were the owners of the defendant clinics when in fact Joseph (a layperson) actually controlled and oversaw all material aspects of the operation of the defendant clinics, including patient care.

33.     At all relevant times, Joseph maintained control of the defendant clinics' bank accounts, had control over billing submitted to insurers like Allstate, and exercised control over patient care through meetings with patients outside the presence of treating chiropractors and providers and implementing treatment quotas and directives.

34. Joseph's actual ownership and control of the defendant clinics, and the defendants' misrepresentations regarding the same, rendered every bill submitted to Allstate unlawful and non-compensable.

35. Independent of the unlawfulness that applies to every bill at issue, and as described in more detail below, the defendants' utilization of a predetermined protocol of treatment (discussed *infra*) through which patients were prescribed highly similar services that were designed to maximize the amount of the bills and had no relationship to clinical presentation or patient needs, also rendered every bill at issue herein medically unreasonable and non-compensable.

36. This predetermined protocol did not take into consideration individual patient medical needs, injuries, or comorbidities, but instead was designed to generate charges as quickly as possible regardless of clinical justification and the standard of care.

37. The defendants transmitted bills and associated records for their purported services to Allstate through the U.S. Mail and via faxes.

38. The defendants were aware that Allstate would rely, and Allstate did in fact rely, on these fraudulent bills and records in adjusting and paying insurance claims.

## V.    <u>BILLING FOR SERVICES NOT RENDERED</u>

39.    The defendants regularly billed for services, treatment, and testing that were never rendered to the patients at issue herein.

40.    Many of the alleged services billed by Ortiz Health and Align required skilled, one-on-one attention from a qualified provider in order to be billed, including therapeutic exercises, neuromuscular reeducation, manual therapy, and therapeutic activities, all of which were among the most commonly billed services by the defendants.  *See* Exhibits 1 and 2.

41.    One-on-one treatments are also timed services that cannot be billed unless the provider spends the requisite amount of time rendering the services.

42.    For the modalities routinely billed by the defendant clinics, fifteen (15) minutes of qualified one-on-one supervision per unit of service billed was required.

43.    Both former physicians and patients have confirmed that the defendants provided neither the required one-on-one supervision to bill for these types of treatments nor the time required to make the treatments billable (if they were performed at all, which often they were not).

44.    A chiropractor formerly employed by Ortiz Health and Align named James Wilczanski, D.C. ("Wilczanski") reported to Allstate that a treatment protocol was implemented by Joseph that included billing for two (2) units of alleged

treatment for modalities such as manual therapy, therapeutic exercises, neuromuscular reeducation, and therapeutic activities for every patient.

45.     Wilczanski recounted instances of observing patients undergoing modalities for no more than one (1) to two (2) minutes and treatment sessions that were completed well before any meaningful (and therefore billable) treatment had occurred.

46.     For example, Align billed for several treatments to C.H. (Claim No. 0766332209)[1], including manual therapy, dry hydrotherapy, therapeutic activities, and neuromuscular reeducation that required timed one-on-one supervision that was not provided.

47.     C.H. testified that many of the purported modalities billed by Align were unsupervised, including dry hydrotherapy.

48.     As detailed below, dry hydrotherapy is an atypical and unproven form of treatment and therefore does not have a Current Procedure Terminology ("CPT") code[2] assigned by the American Medical Association ("AMA").

---

[1] To protect the confidentiality of its insureds and the patients at issue herein, Allstate refers to them in this Complaint by initials and Allstate claim number. The defendants are aware of the Allstate claim number, as the defendants included the claim number on the bills they submitted to Allstate.

[2] CPT codes are published annually by the American Medical Association ("AMA") to facilitate the efficient processing of healthcare charges by insurance carriers and other private and governmental healthcare payors. Providers who are subject to the Health Insurance Portability and Accountability Act are required to use CPT codes.

49.    The defendants billed for dry hydrotherapy using CPT code 97039, which is defined as a "<u>Constant Attendance</u> Physical Medicine and Rehabilitation Modality" (emphasis added).

50.    Thus, Align expressly represented to Allstate that its performance of dry hydrotherapy, including to C.H., was attended by a healthcare provider.

51.    C.H. explained in testimony that her dry hydrotherapy sessions were unattended and therefore Align billed Allstate for services not rendered.

52.    Align also billed for purported neuromuscular reeducation to C.H. through use of a wobble chair that C.H. also testified was unsupervised.

53.    To properly bill for neuromuscular reeducation, a qualified provider must provide constant one-on-one supervision of the patient and be actively engaged with the patient through the duration of the treatment session.

54.    Further, even if the defendants had provided supervision of this claimed service, which they did not, none of the services that the defendants claimed as neuromuscular reeducation, including the wobble chair allegedly used by C.H., were actually sufficient to bill for that modality.

55.    Neuromuscular reeducation is a modality used for improving balance and coordination of the lower extremities for patients who have suffered serious medical conditions such as strokes, which is not applicable to any of the patients at issue herein.

56.    C.H. also testified that Align gave her instructions on how to perform exercises, which were billed by Align as including one-on-one supervision, and directed her to perform the exercises on her own while providers saw to other patients.

57.    Billing for leaving a patient to perform exercises on her own while attending to other patients is inappropriate and constitutes billing for services not rendered.

58.    The treatments billed relative to C.H. were not atypical; they were part of the same predetermined protocol used by the defendants for all patients and were documented and performed in the same manner to C.H. as they were to the patients at issue herein, all of which constituted billing for services not rendered for the same reasons.

59.    The defendant clinics also consistently failed to accurately document the time spent performing each alleged modality, the specific exercises allegedly performed, and the body parts allegedly treated.

60.    Instead, the clinic defendants submitted records with pre-printed times that always claimed that exactly fifteen (15) minutes was spent performing nearly every modality, as illustrated below:

| 97010 | Hot or Cold packs 15 min. |
|---|---|
| 97012 | Cervical Traction 15 min. |
| G0283 | EMS/Interferential 15 min. |
| 97035 | Ultrasound, 1 Unit |
| 97110-52 | Therapeutic Exercise 15 min. |
| 97112 | Neuromuscular Re-Ed/ PNF |
| 97124-59 | Therapeutic Massage |
| 97124 | Vibratory Massage 15 min. |
| 97140-59 | Manual Ther./Myofascial 15 min |
| 91750 | Therapeutic Procedure 2< |
| 97530 | Therapeutic Activities 15 min. |
| 97535 | ADL Review |

61.    It is simply not possible that the clinic defendants rendered exactly fifteen (15) minutes for each of the thousands of timed treatments at issue in this Complaint and these pre-printed claims to have done so necessarily constitute misrepresentations.

62.    As another representative example of the defendants billing for timed services that were not billable at all, Ortiz Health billed for alleged manual therapy to A.M. (Claim No. 0613870096) on February 3, 2021.

63.    Manual therapy is a timed service that requires constant one-on-one supervision by a qualified provider for every fifteen (15) minute unit billed.

64.    Ortiz Health did not come close to satisfying the requirement for this to be a billable service as it admitted in its own record that it spent only two (2) minutes on the modality, which does not qualify as a billable service at all.

13

65.    In order to properly bill for one-on-one therapeutic exercises, the documentation must clearly indicate the need for the exercise and have evidence to support one-on-one care requiring the skills of a therapist.

66.    Many of the purported exercises billed by Ortiz Health and Align were repetitive and did not require one-on-one treatment at each appointment.

67.    For example, patients do not need to be re-taught how to use equipment like a stationary bike or treadmill at every visit, making it inappropriate to include time performing these types of exercises as skilled, one-on-one therapy even if one-on-one supervision had been provided, which it was not.

68.    The defendants also billed for services that simply were not done at all.

69.    Defendant Align billed Allstate for an alleged experimental treatment called extracorporeal shockwave therapy ("ESWT") relative to C.H. (Claim No. 0766332209) on at least four (4) separate occasions.

70.    After being provided information about how this purported treatment looks and is administered, C.H. testified that she never received the treatment at all.

71.    The defendants also routinely billed for purported evaluations of patients that did not occur at all.

72.    As discussed further below, the defendants regularly billed for as many as eight (8) separate treatments on each date they claimed to render treatment to

patients at issue herein in order to generate bills that totaled several hundred dollars on each date of service.

73.    Without any explanation or changes to services rendered, the defendants also routinely claimed to re-evaluate patients on numerous dates that involved nothing more than application of their predetermined treatment protocol, if any treatment was actually rendered at all.

74.    A re-evaluation is only a billable service if it actually involves obtaining an interim medical history from the patient, performing an actual examination, and using the information obtained in the treatment plan.

75.    The defendants regularly billed for purported re-evaluations that included none of these required components.

76.    For example, defendant Align billed for an alleged initial evaluation of E.S. (Claim No. 0705933967) on March 14, 2023 and immediately started the patient on its predetermined protocol of at least seven (7) different treatment modalities billed on as many dates as possible.

77.    In addition to the excessive treatment, over the next sixteen (16) days, Align billed for an alleged six (6) re-evaluations of E.S., on March 16, March 21, March 22, March 27, March 28, and March 31.

78.    Not only is this number of re-evaluations over the course of two weeks inappropriate and unnecessary on its face, there was never any change to E.S.'s

treatment plan and there was no actual examination performed on any date except March 27, meaning that re-evaluations were not actually performed at all.

79.    This phantom billing continued throughout E.S.'s entire course of alleged treatment, including on three (3) days in a row from April 24 to April 26, 2023.

80.    As with the other examples of billing for services not rendered set forth herein, this practice was not unique to E.S. nor to Align.

81.    For example, defendant Ortiz Health billed for at least twelve (12) separate evaluations of M.C. (Claim No. 0669110405) over an alleged course of treatment that lasted less than two (2) months in May and June 2022.

82.    The defendants also regularly billed for alleged self-care/home management training that was not actually performed.

83.    Self-care/home management training is properly billed when a patient is instructed on how to manage an injury at home and how to prevent a secondary injury or how to prevent future exacerbations.

84.    The AMA has provided a clinical example to illustrate the proper usage of self-care/home management training:

> The patient is a 65-year-old woman recently discharged from the hospital with a diagnosis of CVA resulting in a right hemiparesis. The patient lives alone and wants to be able to remain in her home. The initial evaluation has revealed performance deficits in bathroom activities and meal preparation. At the home site, the therapist recommends and sets up the proper adaptive equipment in the

bathroom, so the patient can safely transfer to toilet and bathtub by using compensatory techniques.

In the kitchen, the therapist teaches and observes meal preparation using one-handed techniques and special adaptive equipment. The therapist must assure that the patient's functional level is sufficient to perform necessary self- care and home-management activities within safe limits (e.g., picking items off floor, lifting pots from stove, reaching items in cupboards, opening drawers).

85.    Not a single instance of the defendants' billing for self-care/home management training meets the criteria established by the AMA.

86.    None of the patients at issue herein received self-care instruction that was individualized to address their specific needs.

87.    The defendants never inquired about patients' living arrangements, and none of the purported treatment billed was actually conducted in the patients' home settings.

88.    Instead, the defendants reported that they provided the type of common sense advice to patients that should be done as a matter of course such as to "[a]void activities and postures that aggravate condition," yet billed this as self-care/home management training.

89.    The defendants' submission of bills for services that were not performed was an integral component of their intentional misrepresentations to defraud Allstate and Allstate is entitled to all damages sustained as a result of such

submissions, including a return of all money paid in reliance on and as a result of such bills.

## VI.    <u>UNLICENSED AND UNLAWFUL SERVICES</u>

90.    The Florida Health Care Clinic Act, Fla. Stat. § 400.990, *et seq.*, requires healthcare clinics to have a license to operate unless a specific statutory exemption applies.

91.    Neither Ortiz Health nor Align ever possessed a license during the period at issue in this Complaint and therefore all of their bills were "noncompensable and unenforceable" under Fla. Stat. § 400.9935(3) unless they qualified for a statutory exemption from the licensing requirement at the time they allegedly provided treatment or services.

92.    The only statutory exemption that could conceivably apply to Ortiz Health or Align is Fla. Stat. § 400.9905(4)(f), which requires that each exempt location of a practice be wholly owned by a physician and that each such location be "directly supervised" by the owning physician.

93.    Defendant Joseph intentionally named the defendant clinics to create the appearance that chiropractic physicians were the owners of the clinics when in fact she, a layperson who could not qualify for an exemption from Florida Agency for Health Care Administration ("AHCA") licensure, was the actual owner and supervisor.

94. Ahitsha Ortiz, D.C. ("Ortiz"), the namesake of defendant Ortiz Health, was claimed by the defendants to be the owner of that clinic, thus entitling it to an exemption from AHCA licensure.

95. However, Ortiz disclosed to Allstate that layperson defendant Joseph was the actual owner of Ortiz Health and the current owner of Align, thus disqualifying both clinics from any applicable statutory exemption to AHCA licensure.

96. Ortiz further explained that Joseph hired Ortiz in 2016 to work at what was then known as Conroy Chiropractic.

97. At the time, Conroy Chiropractic listed its owner as a chiropractor named Thuy Nguyen, D.C. ("Nguyen"), but Ortiz observed that Nguyen was merely a staff chiropractor working for Joseph.

98. Later in 2016, Joseph changed the name of the clinic to Ortiz Health and presented Ortiz with a bill of sale purporting to transfer the clinic into her name, but no consideration was paid and Ortiz reported that she remained as a staff chiropractor and that there was "no real sale."

99. It was Ortiz's understanding that her "name was used on the corporate documents because [she is] a doctor."

100. Nothing about the operation of Ortiz Health changed other than the name, including no changes to the staff, office equipment, and procedures.

101.   Thus, this name change and purported conveyance of title was a ruse to create the appearance of ownership by a chiropractor as Joseph maintained complete control of Ortiz Health and made all business decisions regarding Ortiz Health.

102.   Among the significant business decisions made and overseen by Joseph during Ortiz's tenure was an expansion of Ortiz Health to two (2) additional locations.

103.   Ortiz also reported that Joseph operated another chiropractic clinic named Ocoee Rehab & Wellness Center, Inc. ("Ocoee Rehab") and that Ocoee Rehab was also rebranded to Ortiz Health.

104.   Joseph's control over the Ortiz Health clinics included hiring and firing of staff and handling all billing submitted by Ortiz Health.

105.   One employee hired by Joseph during Ortiz's time at the defendant clinics was defendant Bacallao, who was brought on as a staff chiropractor at Ortiz Health.

106.   Ortiz discovered Joseph had full control of the business bank accounts when she noticed that Joseph had withdrawn large amounts of cash and written checks to herself and her family members from the Ortiz Health bank accounts.

107.   When Ortiz questioned Joseph on her handling of the business bank accounts, the relationship between Ortiz and Joseph deteriorated and Joseph pushed Ortiz out.

108.  Joseph renamed Ortiz Health to Align and replaced Ortiz with defendant Bacallao as the purported owner of the re-branded Align clinic.

109.  Like Ortiz, Bacallao also did not actually supervise Align's business activities, nor did he ensure Align's compliance with the law.

110.  If Bacallao had legitimately and actually supervised Align, he would have stopped the wrongful conduct and bad practices of Align, as detailed throughout this Complaint and which include rampant billing for services not rendered, falsifying records, unnecessary and excessive treatment, and fraudulent billing practices.

111.  Former chiropractor Wilczanski also confirmed Ortiz's account of the operation and control of the clinics.

112.  Wilczanski explained that all employees of the defendant clinics, including chiropractors, were ultimately hired by Joseph even as they were interviewed by the supposed owner of the clinics.

113.  Wilczanski also confirmed that Joseph oversaw all of the billing and coding, handled all of the collections and banking, signed payroll checks, and, most importantly, directed the care of patients of the clinics.

114.  Wilczanski recounted being approached by Joseph to inform him of the change of ownership from Ortiz to Bacallao; however, the only change to the clinics

was the name and supposed owner as operations, staff, medical recordkeeping, processes, and furnishings of the clinics remained the same.

115.    In light of all of the above, all of the services billed to Allstate by or on behalf of Ortiz Health and Align were unlawful as the defendant clinics were never licensed and never qualified for a statutory exemption to licensure.

116.    Therefore, none of the bills submitted to Allstate by or on behalf of Ortiz Health and Align were ever compensable and Allstate is entitled both to a return of all monies it paid as a result of such bills, all damages it incurred as a result of such bills, and a declaration that it is not obligated to pay any pending bills from either defendant clinic.

## VII.    FALSIFIED AND FABRICATED RECORDS

117.    The defendants submitted altered, forged, and fabricated medical records in an effort to conceal their fraud and create the appearance of significant injury in order to support their charges submitted to Allstate for unnecessary services.

118.    As detailed below, the defendants' predetermined treatment protocol called for excessive and unnecessary *pro forma* treatment, so it is no surprise that records were altered and falsified to support this practice.

119.   As an initial matter, the defendants' records were largely pre-printed in ways that were material and that evidence that no serious evaluations of or medical decision making as to patients were really done.

120.   Ortiz Health and Align also falsified diagnoses to create the appearance that the extensive chiropractic treatment for which they billed was proper.

121.   Patients were nearly always diagnosed with sprains of their entire spines, even when they did not complain of pain in all areas.

122.   Further, even when patients did purportedly complain of pain in all areas of their spines, their diagnoses (which were expressly used as the purported rationale for the excessive treatments discussed below) did not change even after they reported that pain was resolved.

123.   As just one example, B.R. (Claim No. 0745496587) reported on September 3, 2024 that she had 0/10 pain in her mid and low back, but Align nevertheless diagnosed her with a lumbar (i.e., low back) sprain on that date and used that diagnosis as the express basis to bill for treatment to B.R.'s lumbar spine.

124.   Similarly, on September 13, 2024 and September 20, 2024, B.R. reported having 0/10 pain in her neck and lumbar spine, but was still diagnosed with sprains in both areas and allegedly administered treatment that was expressly intended to treat those fabricated injuries.

125.    The defendants also misrepresented who, if anyone, actually rendered the treatments at issue herein.

126.    For example, defendant Align generated a ledger that was provided to B.R.'s (Claim No. 0745496587) attorney that claimed that "RLB" (i.e., defendant Bacallao) provided all of B.R.'s alleged treatments.

127.    In fact, the actual records and bills from each individual date show that treatment was actually largely rendered, if at all, by others, including a separate chiropractor named Christopher Varnum, D.C. and other staff of Align's office.

128.    Fabricated, exaggerated, and falsified records were intended to create the appearance of severity of injury and necessity of treatment and were intentionally used by the defendants to induce Allstate to make payment for alleged treatments that were not performed, were unlawful, were excessive, were medically unnecessary, and which were never intended to be performed at all, and Allstate is entitled to a return of all money paid as a result of such fabricated records.

## VIII. UNREASONABLE    AND    UNNECESSARY    FRAUDULENT TREATMENT

129.    The defendants' willingness to bill for services not rendered and unlawfully rendered and to fabricate records demonstrates their willingness to also bill for treatment that was unreasonable and unnecessary.

130.   The defendants' goal was to bill as much as possible, regardless of whether treatment was reasonably necessary to patients' care, recovery, or rehabilitation, in order to generate bills for submission to Allstate.

131.   To maximize their financial gain, the defendants adhered to a predetermined protocol of unnecessary, indiscriminate, and excessive treatment and testing, as discussed more fully below.

132.   The defendants' purported treatment violated standards of care as the treatment was not indicated, and was redundant, excessive, and repeated without any benefit to patients.

133.   The unnecessary treatment billed by the defendants, discussed more fully below, includes the treatment and patients set out in the charts annexed hereto at Exhibits 1 and 2.

134.   All of the bills submitted by the defendants seeking payment for unnecessary, excessive, unlawful, and unreasonable treatment are fraudulent.

135.   Allstate is not required to pay the defendants for treatment that was medically unnecessary, and it is entitled to the return of money it was induced to pay as a result of the defendants' wrongful conduct.

136.   None of the above facts were known to Allstate until it undertook its investigation that resulted in the commencement of this action, and are not evident within the four corners of the medical records and bills submitted to Allstate.

## A.    THE DEFENDANTS' PREDETERMINED TREATMENT PROTOCOL

137.   Each patient of the defendant clinics was assessed as having extremely similar reports of complaints and purported objective findings regardless of the type of accident claimed and regardless of each patient's age, sex, alleged injury, accident facts, co-morbidities, and pre-accident condition.

138.   Initial evaluations reported by the defendant clinics nearly always included purported range of motion testing in various planes of movement in the areas of the spine for which patients supposedly complained of pain.

139.   The defendant clinics included boilerplate statements with purported measurements that patients had "pain from 75% to 100% of ROM" in every plane of movement, regardless of whether patients had normal range of motion or severely restricted range of motion.

140.   It is simply not plausible that nearly every patient experienced pain at the exact same ranges of movement at every appointment.

141.   More importantly, regardless of whether a patient supposedly had diminished range of motion or pain with movement, the treatment plans ordered by the defendant clinics were not materially different.

142.   For example, O.S. (Claim No. 0685531444) was claimed to have 0% diminishment in range of motion in his cervical spine and just minimal diminishment

in range of motion in flexion and extension of his lumbar spine at an initial evaluation billed by Ortiz Health on September 22, 2022.

143.    Despite this benign presentation and clear ability to move, O.S. was prescribed the same excessive course of therapy, including numerous passive modalities to be billed on every date, as every other patient of Ortiz Health.

144.    By comparison, Ortiz Health claimed that M.C. (Claim No. 0669110405) had diminished range of motion in nearly every plane of movement in her spine on May 10, 2022, but was prescribed a materially identical plan of care as O.S.

145.    A patient who has little pain and nearly full movement in relevant body parts simply does not require the same course of treatment as a patient who has severely restricted movement, and the defendants' use of identical treatment plans for patients with such dissimilar presentations evidences that none of their treatment plans were patient specific.

146.    The defendants also submitted records containing purported results of orthopedic tests and maneuvers to create the appearance that patients were injured and to support implementation of their predetermined treatment protocol, but in fact the results, if the tests were done at all, were not actually used.

147.    For example, one of the tests used by the defendants to create the appearance of legitimacy of their records and treatment plans is called a Spurling's test.

148.    The defendants routinely simply claimed that Spurling's tests were positive, but did not make any assessment of dermatomal distribution of patients' supposed symptoms, which is imperative to make the results meaningful.

149.    Similarly, the defendants routinely claimed that patients tested positive on straight leg raise tests, but merely saying that a patient tested positive is meaningless as the point of the test is to record the angle of the patients' raised legs when pain is elicited as well as the nature of the pain (e.g., axial back pain vs. radicular symptoms).

150.    Indeed, the defendants' own pre-printed boilerplate records acknowledge that simply claiming a straight leg test is positive is not the end of the analysis and that further information is necessary to make the supposed results clinically meaningful, but such additional information was not obtained or used by the defendants.

151.    The defendants also failed to assess whether patients had previously attempted the types of treatments included in their predetermined protocol and therefore billed for alleged implementation even when there was clear evidence that such treatments were not efficacious for patients.

152.   For example, on August 28, 2024, Align billed for an initial evaluation of B.R. (Claim No. 0745496587) and, using the types of meaningless range of motion and orthopedic tests discussed above as purported justification, prescribed its normal predetermined protocol of excessive therapy modalities.

153.   Align completely omitted from its evaluation that B.R. had already undergone a course of chiropractic treatment with a different provider that included many of the same modalities, including electrical stimulation, ultrasound, neuromuscular reeducation, and chiropractic manipulative treatment, and that these had failed to relieve B.R.'s symptoms.

154.   Rather than attempt different treatment that had not already failed for this patient, Align prescribed and billed for the same predetermined course of treatment used for all patients at issue herein.

155.   Ortiz Health's and Align's predetermined treatment plans were made up of an incredible amount of services billed on each date of alleged treatment, typically including hot/cold packs, ultrasound, therapeutic exercise, neuromuscular reeducation, manual therapy, therapeutic activities, electrical stimulation, dry hydrotherapy, laser therapy, chiropractic manipulation treatment, and ESWT.

156.   These modalities were billed without any rational medical basis, and often they were billed when patients were not injured at all.

157.   For example, on April 20, 2022, B.V. (Claim No. 0666886528) was allegedly evaluated at Ortiz Health and did not report any pain at all in her cervical spine.

158.   Despite this lack of pain in her cervical spine, Ortiz Health generated a record that purported to test and record range of motion (which was normal) and orthopedic maneuvers (which were normal) in B.V.'s cervical spine to create the appearance of injury in that area.

159.   Ortiz Health then diagnosed B.V. with a sprain in her cervical spine with absolutely no objective or subjective support, and billed for over a month of treatment supposedly targeted at that diagnosis.

160.   Similarly, on September 13, 2024, Align billed for eight (8) different treatment modalities to B.R. (Claim No. 0745496587), including manual therapy, hot/cold packs, electrical muscle stimulation, neuromuscular reeducation, therapeutic activities, dry hydrotherapy, and ESWT.

161.   B.R.'s main complaint was of shoulder pain rated a 6/10 on the pain scale with a secondary complaint of mid-back pain rated at 5/10.

162.   B.R. either did not report pain or rated her pain as 0/10 in her neck and lower back.

163.   Just one (1) of the eight (8) different treatments billed by Align was targeted to B.R.'s claimed shoulder pain and the other seven (7) treatment modalities billed on that date were administered to body parts with mild to non-existent pain.

164.   Application of treatments to body parts that are uninjured clearly evidences the defendants' willingness to bill for as many modalities as possible, regardless of medical necessity.

165.   Additionally, these treatments to B.R. were allegedly administered even though Align was awaiting MRI imaging results that it had ordered.

166.   Another component of the defendants' predetermined protocol was to order MRIs from associated provider Clear View Diagnostic Corp. at the outset of courses of purported treatment to create the appearance of injury and to generate charges to Allstate.

167.   Indeed, Wilczanski confirmed that Joseph instructed chiropractors to order MRIs for all patients around their third or fourth visit and failure to comply would result in termination.

168.   If providers at Ortiz Health and Align were concerned enough about the severity of patients' (including B.R.'s) symptoms to send them for MRI imaging, it would be unreasonable to also and at the same time have the patient undergo six (6) or more different types of treatment to body parts that are suspected to be severely injured.

169.   In reality, the defendants never actually believed patients had serious injuries and both the MRI orders and the excessive courses of treatment were intended to generate charges as quickly as possible regardless of medical necessity.

170.   The results of the MRIs ordered by the defendants were also not used for any purpose, as treatment plans continued unchanged regardless of the results.

171.   For example, Align ordered MRIs of E.S.'s (Claim No. 0738405877) cervical spine on December 29, 2023 that purportedly revealed three (3) herniated discs.

172.   Despite having evidence that E.S.'s injury may be more severe than the sprains diagnosed by Align, nothing about E.S.'s treatment plan changed with this diagnostic information.

173.   Similar to mandated MRIs, Joseph also ordered chiropractors to perform re-evaluations of patients earlier in their course of supposed treatment timeline.

174.   Further, even though the defendants regularly billed for re-evaluations that were not actually performed, as detailed above, patients were rarely actually re-evaluated and treatment plans were never materially changed even when cursory re-evaluations were documented.

175.   The defendants' predetermined treatment protocol, which nearly always claimed that modalities were performed to address at least four (4) separate diagnoses, was also instituted so strictly that it resulted in absurd claimed treatment.

176.   For example, the defendants routinely claimed to perform neuromuscular reeducation – for which they expressly listed the "rationale" as a modality to "improve balance, coordination, strength, flexibility, and ROM" – to treat diagnoses that had absolutely nothing to do with balance, coordination, strength, flexibility, or range of motion.

177.   For example, Align's excessive course of treatment prescribed to B.R. (Claim No. 0745496587) on August 30, 2024 included repeated neuromuscular reeducation targeted to B.R.'s headaches, which could not have actually had any relationship to the stated rationale for the treatment.

178.   Use of a predetermined treatment protocol to order and bill for highly similar courses of treatment regardless of actual patient need cannot be medically necessary or appropriate and therefore such treatment was never compensable under Florida law.

**B.   EXCESSIVE COURSES OF ALLEGED TREATMENT**

179.   The courses of purported chiropractic treatment billed by the defendants were not designed or intended to treat any actual injury, but rather were used as a means to generate billing to Allstate.

180.  Ortiz Health and Align almost never altered or discontinued their predetermined treatment plans, demonstrating that the chiropractic treatment was not ordered to treat any actual condition or injury.

181.  The excessive and predetermined courses of therapy billed by Ortiz Health and Align did not change even when it was clear that the treatment was ineffectual to treat the reported injuries.

182.  For example, Align billed for purported treatment to M.P. (Claim No. 0628485948) from June 6, 2023 through August 29, 2023.

183.  During that purported period of treatment, M.P.'s treatment consisted of the defendants' typical predetermined plan of at least (6) modalities billed per treatment session.

184.  Within the first three (3) weeks of purported treatment, M.P.'s pain levels reduced from 8/10 to 2-3/10.

185.  However, Align continued to bill for another two (2) months using the same predetermined and excessive treatment plan with little to no change in the modalities billed despite this drastic improvement in M.P.'s condition.

186.  As another example, Ortiz Health billed Allstate for a course of therapy to address R.A.'s (Claim No.  0613332063) alleged lumbar spine pain.

187.   Ortiz Health billed for a total of ten (10) extensive treatment sessions to R.A., each of which included inappropriate billing for neuromuscular reeducation through use of the wobble chair.

188.   Through the duration of R.A.'s purported treatment with Ortiz Health, his lumbar pain never rated less than 7/10 on the pain scale and by the end of his treatment, his lumbar pain had increased to 8/10.

189.   Despite this evidence that the treatment was making R.A. worse, the treatment plan was not altered by Ortiz Health.

190.   As another example, M.C. (Claim No. 0669110405) was directed to fill out a pain disability questionnaire ("PDQ") on presentation to Ortiz Health on May 10, 2022, and her PDQ score was rated at 73.

191.   Following two (2) weeks of alleged treatment, on May 25, 2022, M.C. filled out another PDQ and on this date her score was rated at 82, meaning she had a greater than 10% <u>increase</u> in disability due to pain as a result of the extensive treatment billed by Ortiz Health.

192.   Despite this clear evidence that the treatment was hurting rather than helping M.C., there was no material change at all made to M.C.'s treatment plan by Ortiz Health.

## C.   IMPROPER AND UNNECESSARY TREATMENTS

193.   The defendants' predetermined treatment protocol also included the use of experimental and unproven treatments, including ESWT, dry hydrotherapy, and low level laser therapy.

194.   The defendants' billing for these types of treatment was particularly unreasonable because they were administered even before attempting traditional therapy modalities that are widely accepted and have been shown to provide benefit to patients.

195.   Rather than use experimental treatments as a secondary plan after proven methods were attempted, the defendants immediately started billing for these purported treatments because they were charged at much higher rates and therefore allowed the defendants to more quickly generate extensive bills to Allstate.

### 1.   Shockwave Therapy

196.   Beginning in 2024, Align started billing for experimental extracorporeal shockwave therapy (ESWT), for which it charged an absurd $400 for fifteen (15) minutes or less of alleged treatment.

197.   ESWT involves the application of high-energy acoustic waves to a patient's skin to supposedly break down tissue.

198.   Unlike many other treatment modalities, including typical over-the-counter medications, application of cold packs, traction, electrical stimulation, and

36

other treatments regularly billed by the defendants, ESWT is intended to be pro-inflammatory rather than anti-inflammatory and therefore contraindicated for patients undergoing anti-inflammatory treatments or using anti-inflammatory medications such as ibuprofen.

199.  The defendants did not instruct their patients to refrain from anti-inflammatory treatments and in fact often billed for treatments that had anti-inflammatory effects contemporaneously with shockwave therapy, which rendered the treatments pointless.

200.  Indeed, the defendants often expressly stated that their treatment rationale for the many different modalities billed on each date of service was to reduce inflammation despite also billing for alleged shockwave therapy on the same dates.

201.  For example, Align billed for application of dry hydrotherapy and ESWT to the lumbar area of G.H. (Claim No. 0734682123) on multiple dates starting in December 2023, when G.H.'s reported pain levels were mild and rated 4/10 on the pain scale.

202.  As detailed below, dry hydrotherapy is an anti-inflammatory treatment that purports to increase blood flow and reduce muscular tension.

203.  Application of dry hydrotherapy and ESWT to the same area during the same treatment session is contraindicatory and there would never be any reasonable

or rational medical basis to attempt both to increase and reduce inflammation to the same body part at the same time.

204.    Similarly, Align billed Allstate for four (4) separate ESWT sessions to C.H.'s (Claim No. 0766332209) lumbar spine area at the same time it also billed for dry hydrotherapy to the same area.

205.    In another example, on September 20, 2024, Align billed for both ESWT and dry hydrotherapy to B.R.'s (Claim No. 0745496587) thoracic spine.

206.    None of these treatments could have been used as a part of any medically appropriate treatment plan and they were performed, if at all, simply to increase the amount billed to Allstate.

207.    The mechanism of ESWT treatment is a machine that uses compressed air to accelerate a projectile up to 80 to 90 kph within a guiding tube that strikes a metal applicator placed on the patient's skin.

208.    The application of ESWT is only approved by the United States Food and Drug Administration ("FDA") for two specific types of injury: (1) lateral epicondylitis (commonly known as tennis elbow) and (2) chronic plantar fasciitis, neither of which are acute injuries that may be sustained in a motor vehicle accident (meaning Allstate could not have any liability to pay for these treatments pursuant to the automobile liability insurance policies at issue in this Complaint).

209.   The defendants never billed for ESWT as a treatment for either of these FDA-approved conditions.

210.   Instead, the defendant clinics billed for using ESWT as an unproven treatment for alleged back and neck pain.

211.   The federal government has deemed ESWT to be medically unnecessary as a purported treatment for back and neck pain, and has stated that ESWT is "not reasonable and necessary for the treatment of musculoskeletal conditions," because "[t]he available evidence suggests that further research is needed to establish the efficacy and safety of high energy ESWT in the treatment of musculoskeletal conditions."

212.   Not only was the defendants' application of ESWT always medically unnecessary, it was also billed excessively.

213.   Providers who offer ESWT, whether for its FDA-approved uses or for off-label treatment, typically subject patients to only a handful of sessions.

214.   Sessions are also spaced out to give patients' muscles time to recover and most providers recommend spacing out sessions by one (1) or two (2) weeks.

215.   Contrary to this typical and logical practice, Align regularly billed for ESWT at consecutive appointments to increase the bills submitted to Allstate.

216.   For example, on December 26, 2023, Align billed for purported ESWT administered to E.S., F.S., and N.S. (Claim No. 0738405877)

217.   Align then billed again for ESWT to all three (3) patients the very next day, December 27, 2023.

218.   As detailed above, ESWT is a pro-inflammatory treatment and patients report that it is painful.

219.   Besides the complete lack of medical necessity to support the use of ESWT to address acute injuries to the back (since the theory is that it restarts the natural healing process that would not be dormant during the acute stage of injury), it is simply not credible that a patient would be willing to undergo shockwave on multiple occasions while claiming to be in significant pain if the treatment was actually administered properly.

220.   Align also billed for anti-inflammatory modalities to all three (3) of E.S., F.S., and N.S. on the same dates as ESWT, including electrical stimulation and dry hydrotherapy, which makes no medical sense.

## 2.   Dry Hydrotherapy

221.   The defendants regularly billed for alleged dry hydrotherapy treatment as part of their predetermined treatment protocol.

222.   This modality is also referred to as "hydromassage" or "aqua massage" and involves a patient sitting or lying on a chair or bed filled with water and with pulsating interior jets.

223. In other words, the application of this modality is pleasant and more akin to a spa treatment than to medical therapeutic treatment.

224. There are no peer reviewed studies evaluating the use of this therapy in patients with chronic pain conditions and it is not covered by the Centers for Medicare and Medicaid Services ("CMS") or commercial payers.

225. The AMA has not assigned a CPT code for the use of dry hydrotherapy – because it is experimental and unproven – so the defendants billed for it using a CPT code for miscellaneous and otherwise undefined services (97039).

226. The defendants routinely billed Allstate for alleged dry hydrotherapy along with other alleged treatments that were clearly redundant, including application of hot packs and manual therapy.

227. For example, on September 20, 2024, Align billed for dry hydrotherapy and hot compress therapy to B.R.'s (Claim No. 0745496587) thoracic spine, both of which included the use of heated water to potentially aid in the patient's recovery.

228. Similarly, Ortiz Health billed Allstate for dry hydrotherapy and hot compress therapy administered to the cervical, thoracic, and lumbar spine of M.P. (Claim No. 0628485948) on June 14, 2021.

229. The defendants' billing for dry hydrotherapy was unnecessary and non-compensable, particularly when it constituted a redundant part of an already excessive number of treatment modalities.

### 3.    Low Level Laser Therapy

230.    The defendant clinics also billed Allstate for alleged low level laser therapy ("LLLT"), which claims to use red or infra-red light to stimulate cells and supposedly promote healing.

231.    This is another unproven and medically unnecessary treatment that the defendant clinics adopted in order to generate higher charge amounts for submission to Allstate.

232.    LLLT has not been approved to treat any musculoskeletal conditions and there is scant medical evidence that LLLT provides any relief beyond a placebo effect.

233.    Like other modalities billed by the defendant clinics, purported LLLT was repeated without any apparent impact on patients' conditions or reports of pain.

234.    These treatments were included in treatment plans as a matter of course in order to generate bills and not because they were medically necessary or appropriate, and Allstate is not required to remit payment for these non-compensable alleged treatments.

## IX.    FRAUDULENT BILLING PRACTICES

235.    Providers like the defendants have a responsibility to select and submit the billing code that accurately and truthfully identifies the services performed and the complexity involved in rendering those services.

236.    The defendants failed to meet this responsibility and instead submitted bills at unreasonable charges for medically unnecessary and excessive services and used fraudulent billing practices, as discussed *infra.*

237.    The medical records, bills, and invoices submitted to Allstate by the defendants contained CPT and Healthcare Common Procedure Coding System ("HCPCS") codes.

238.    Providers such as the defendants are subject to the Health Insurance Portability and Accountability Act and are thus required to use CPT codes when submitting bills.

239.    By utilizing CPT and HCPCS codes to submit billing to Allstate, the defendants represented that the services they billed corresponded to and were accurately described by the descriptions for the CPT and HCPCS codes they utilized.

240.    The defendants never communicated to Allstate that they intended that the CPT and HCPCS codes they used to have any meanings other than those ascribed by the AMA and CMS, which publish CPT and HCPCS codes, respectively.

241.    Allstate reasonably relied on the representations and published definitions assigned to the CPT and HCPCS codes billed by the defendants.

242.    Allstate reasonably relied on the defendants' utilization of CPT and HCPCS codes to accurately report the services they rendered to Allstate insureds and claimants.

A.    FRAUDULENT DOUBLE BILLING

243.    The defendants routinely manipulated CPT codes in contravention of the AMA's published guidance in order to bill Allstate multiple times for the same claimed treatment, which is fraudulent double billing.

244.    Double billing occurs when a provider bills separately and additionally for individual components of treatment that are included in another billing code also billed for the same patient on the same date of service.

245.    The defendants routinely double billed services to Allstate, which resulted in tens of thousands of dollars in fraudulent bills.

246.    The defendants' double billing was not simply a matter of inadvertent incorrect coding; it was a targeted method intentionally used by the defendants to induce Allstate to pay multiple times for the same purported services.

247.    For example, Ortiz Health and Align regularly billed Allstate for manual therapy (CPT code 97140) and multiple chiropractic manipulations (CPT codes 98940-98943) for the same patient on the same date of service. *See* Exhibits 1 and 2.

248.    Manual therapy may only be billed with chiropractic manipulations if the manual therapy is performed on separate body regions from the manipulations, which was not done by the defendants.

249.   Ortiz Health and Align were clearly aware that they were not permitted to bill these alleged modalities together, as they routinely also included CPT code modifier 59 on their bills, which is a method used by providers to avoid billing software that detects improper combinations of treatment by claiming that one treatment was somehow unique and billable despite the rules.

250.   Ortiz Health and Align also routinely billed Allstate for electrodes at the outset of treatment, apparently for use with the in-office electrical stimulation that was part of their predetermined protocol (as there is no way for electrodes to be used on their own).

251.   Use of electrodes to administer electrical stimulation treatment is a necessary part of the electrical stimulation service and they are not separately and additionally billable.

252.   Ortiz Health and Align fraudulently double billed for electrodes every time they charged for this improper purpose.

### B.   MULTIPLE BILLS FOR INITIAL EVALUATIONS

253.   The defendants falsely billed for multiple initial patient evaluations for already established patients.

254.   An initial evaluation, by definition, can only happen once per patient.

255.   Coding guidelines for billing for initial evaluations and payment amounts are different than re-evaluations to account for the fact that the clinic is developing entirely new information about a new patient.

256.   The payment for new patient evaluations is higher than for evaluations for established patients.

257.   Despite this, the defendants billed Allstate for new patient evaluations to already established patients.

258.   For example, Align billed for new patient evaluations to E.S. and F.S. (Claim No. 0738405877) on December 6, 2023 stemming from an alleged accident on December 5, 2023.

259.   However, E.S. and F.S. previously treated with Align for another claimed accident in March 2023, for which Align billed Allstate for new patient evaluations, therefore making E.S. and F.S. already established patients with Align.

260.   As such, the evaluations billed by Align on December 6, 2023 should have been billed as established patient evaluations.

261.   Similarly, Ortiz Health billed for a new patient evaluation of E.C. (Claim No. 0596072009) on August 12, 2020.

262.   E.C. previously treated at Ortiz Health for injuries stemming from an alleged collision in 2019, which meant E.C. was already an established patient of Ortiz Health.

263.   There is never any legitimate reason for the same provider to bill for multiple initial evaluations to the same patient, and the bills submitted by the defendants for the same were fraudulent and not compensable.

## X.   **HARM TO PATIENTS**

264.   The defendants' unnecessary and unlawful treatment, as detailed above, and fraudulent billing practices, also detailed above, injured Allstate in its business and property because Allstate was billed for the bogus and unlawful alleged treatment and Allstate tendered payment to the defendants that it would not have paid had the defendants provided true and accurate information about their conduct.

265.   The defendants' alleged treatment and billing practices also harmed patients, who were consumers that were subjected to unnecessary and experimental treatment just so the defendants could inflate insurance claims submitted to Allstate for payment.

266.   Because the defendants actively hid the fact that layperson defendant Joseph actually owned and ran the defendant clinics, patients expected that the defendant clinics were acting lawfully and in accordance with Florida law, including AHCA, and the defendant clinics never told patients that in fact the clinics were not in compliance with applicable law and that a layperson (defendant Joseph) was actually the one directing their treatment.  Patients not being informed of the facts concerning the (lack of) lawfulness, (lack of) reasonableness, and (layperson)

oversight of their treatment was harmful to patients, as the patients were deprived of the ability to make fully-informed decisions about their medical care and risked medical treatment that was not properly determined and managed by a licensed clinic and licensed practitioner (but rather defendant Joseph).

267.   Patients also received less than they were promised by the defendants since their treatment was not lawful and not properly implemented and overseen by a licensed medical professional.

268.   The defendants' patients were also harmed by paying deductibles and copayments to the defendants (*see* Fla. Stat. § 817.234(7)(a)) for unlawful and unnecessary treatment.

269.   Finally, patients were harmed by allowing their PIP benefits (which are capped at a maximum of $10,000 under Florida law) to be used up by the defendants (whose alleged treatment was unlawful and unnecessary) instead of applying the available PIP benefits to legitimate treatment.

## XI.   MISREPRESENTATIONS MADE TO AND RELIED ON BY ALLSTATE

### A.   MISREPRESENTATION BY THE DEFENDANTS

270.   To induce Allstate to promptly pay their claims that were propped up by their fraudulent records and bills, the defendants submitted and caused to be submitted to Allstate false documentation that materially misrepresented that the

services they referred and billed were necessary, that the charges for the same were reasonable, and that all treatment was lawfully and actually rendered.

271.    Every time the defendants submitted bills and medical records to Allstate supporting their claims for insurance benefits, the defendants necessarily warranted that such bills and records related to lawfully and actually rendered and necessary treatment for their patients' care, recovery, or rehabilitation.

272.    There are no less than eight (8) separate reasons why the defendants' alleged treatment was not in fact performed, was not lawful, was not medically necessary, and was fraudulently billed to Allstate:

a.    The defendants unlawfully billed for services without licensure or exemption therefrom;

b.    The defendants routinely billed for services that were not performed at all;

c.    The defendants improperly induced patients to present for medical unnecessary treatment;

d.    The defendants falsified and fabricated diagnoses, complaints, and other material aspects of records submitted to Allstate to create the appearance of necessity for excessive treatment;

e.    The defendants billed for treatments that were excessive and not medically necessary;

f.    The defendants billed for treatments based on a predetermined treatment protocol that had no relation to patients' alleged injuries and were selected solely to maximize charges to insurers like Allstate;

g.    The defendants billed for experimental treatments that were contraindicated, duplicative, and otherwise unnecessary; and

h. The defendants double billed for alleged services in violation of established medical coding guidelines.

273.  As detailed *supra*, the defendants frequently violated standards of care, treated excessively, and billed for treatment without basis or adequate substantiation.

274.  The foregoing facts – including billing for services not rendered, unlawfully billing for treatment without licensure, falsifying medical records, using a predetermined treatment protocol to inflate charges, misrepresenting the necessity of treatment, and billing multiple times for the same purported services – were not, and could not have been, known to Allstate until it commenced its investigation of the defendants shortly before the filing of this action.

275.  The prevalence of such facts and the defendants' failure to abide by accepted standards of care render the treatment and related services by the defendants unnecessary and unlawful (to the extent actually rendered at all).

276.  The fact of improper and unnecessary treatment and billing is present with respect to every patient at issue in this Complaint, including the specific patient examples set out above and in the charts annexed at Exhibits 1 and 2.

277.  Thus, each claim for payment (and accompanying medical records) mailed and faxed to Allstate by, on behalf of, or with the knowledge of the defendants constitutes a misrepresentation because the treatment underlying the claim was not lawful, not reasonable, and not medically necessary.

278.   Through the submission of patient records, invoices, bills, and other medical documentation to Allstate via the U.S. Mail and fax, the defendants attested to the fact, lawfulness, and medical necessity of the alleged treatment for which they billed Allstate.

279.   As the defendants did not render lawful and reasonably necessary medical treatment and services, and misrepresented the treatment and services purportedly performed, each bill and accompanying documentation mailed and faxed by or on behalf of the defendants to Allstate constitutes a material misrepresentation.

### B.   ALLSTATE'S JUSTIFIABLE RELIANCE

280.   The documents submitted to Allstate by the defendants were designed to, and did in fact, induce Allstate to rely on the documents.

281.   At all relevant times, the defendants concealed from Allstate facts regarding the fact, lawfulness, and medical necessity of treatment and services allegedly provided by them to prevent Allstate from discovering that the claims submitted by and on behalf of the defendants were not compensable under Florida and federal law.

282.   These misrepresentations include submitting false medical documentation, including bills, documenting the fact, lawfulness, and necessity of medical treatment and services.

283.   Evidence of the fraudulent scheme detailed in this Complaint was not discovered until after Allstate began to investigate the defendants, revealing the true nature and full scope of their fraudulent scheme.

284.   Due to the defendants' material misrepresentations and affirmative acts designed to conceal their fraudulent scheme, Allstate did not and could not have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

285.   In reliance on and as a result of the defendants' misrepresentations, Allstate paid money to the defendants to its detriment.

286.   Allstate would not have paid these monies had the defendants provided true and accurate information about the fact, lawfulness, and necessity of the medical treatment and services billed.

## XII.   MAIL AND WIRE FRAUD RACKETEERING ACTIVITY

287.   As detailed above, the treatment and services billed by the defendants were not medically necessary, were unlawful, and were fraudulently billed, if performed at all.

288.   The objective of the scheme to defraud Allstate, which occurred throughout the period set out in Exhibits 1 and 2, was to collect insurance payments under Florida law and Allstate policies of insurance, including inducing Allstate to make payments from which the defendants received a financial benefit in response

to claims that were propped up by the defendants' bills for chiropractic services that were not rendered, were not necessary, were not lawfully rendered, and were fraudulently billed.

289.   This objective necessarily required the submission of bills for payment to Allstate.

290.   The defendants created, prepared, and submitted false medical documentation and placed in a post office and/or authorized depository for mail matter things to be sent and delivered by the United States Postal Service or sent faxes over interstate wires.

291.   Documents, medical records, notes, reports, bills, medical diagnoses, letters, correspondence, and requests for payment in connection with the insurance claims referenced throughout this pleading traveled through the U.S. Mail or over interstate wires.

292.   All medical records and bills submitted through interstate wires by the defendants were faxed from the defendants in Florida to Allstate in Illinois and Ohio.

293.   Every automobile insurance claim detailed herein involved at least one (1) use of the U.S. Mail, including the mailing of, among other things, the notice of claim and insurance payments.

294.  Every payment at issue in this Complaint where Allstate was induced to rely on the defendants' false medical records and bills was tendered via check mailed by Allstate using the U.S. Mail.

295.  It was foreseeable to the defendants that submitting bills to Allstate, both directly and through their patients' personal injury attorneys, would trigger mailings and faxes in furtherance of the scheme, including payment of fraudulent bills via checks mailed by Allstate.

296.  The fraudulent medical billing scheme detailed herein generated hundreds of mailings and faxes.

297.  A chart highlighting representative examples of mail and wire fraud arising from the defendants' patient/business files is annexed hereto at Exhibit 3.

298.  As detailed herein, the defendants also submitted, caused to be submitted, or knew medical documentation and claims for payment would be submitted to Allstate via interstate wires and the U.S. Mail related to each exemplar patient discussed in this Complaint and related to the patients identified in Exhibits 1 and 2.

299.  It was within the ordinary course of business for Ortiz Health and Align (by and through their owners and managers defendants Joseph and Bacallao), and the personal injury attorneys with whom they associated, to submit claims for

payment and demands to insurance carriers like Allstate through interstate wires and the U.S. Mail.

300.   Moreover, the business of billing for medical treatment and services by the defendants is regularly conducted by fraudulently seeking payment to which each defendant is not entitled through the use of fraudulent communications sent via interstate wires and the U.S. Mail.

301.   In other words, discrete (claim- and patient-specific) instances of mail and wire fraud are a regular way of doing business for Ortiz Health and Align.

302.   The defendants continue to submit claims for payment to Allstate and, in some instances, continue to commence litigation against Allstate seeking to collect on unpaid claims.

303.   Thus, the defendants' commission of mail and wire fraud continues.

304.   As all of the defendants named herein agreed that they would use (and, in fact, did use) the mails in furtherance of their scheme to defraud Allstate by seeking payment for services that were misrepresented and not compensable, these defendants committed mail fraud, as defined in 18 U.S.C. § 1341.

305.   As all of the defendants named herein agreed that they would use (and, in fact, did use) faxes over interstate wires in furtherance of their scheme to defraud Allstate by seeking payment for services that are not compensable and lawful, these defendants committed wire fraud as defined in 18 U.S.C. § 1343.

306.   Allstate reasonably relied on the submissions it received from Ortiz Health and Align (by and through their owners and managers defendants Joseph and Bacallao), including the representative submissions set out in Exhibit 3 annexed hereto and identified in the representative patient claims above and set out in Exhibits 1 and 2.

307.   As the defendants agreed to pursue the same criminal objective (namely, mail fraud and wire fraud), they committed a conspiracy within the meaning of the RICO Act, 18 U.S.C. § 1962(d), and are therefore jointly and severally liable for Allstate's damages.

## XIII.  DAMAGES

308.   The wrongful conduct by the defendants injured Allstate in its business and property by reason of the aforesaid violations of law.

309.   Allstate's claim for compensatory damages includes (a) payments made by Allstate directly to Ortiz Health and Align (for the benefit and receipt of all of the defendants) in reliance upon and as a result of the defendants' false representations regarding the fact, lawfulness, and necessity of the treatment for which they directly billed Allstate; and (b) payments made by Allstate to the defendants' patients (from which the defendants also received payment) that were based on the fraudulent, misrepresentation-laden bills and records from the defendants.

310.   Although it is not necessary for Allstate to calculate damages with specificity at this stage in the litigation, and Allstate's damages continue to accrue, Allstate has been induced to pay hundreds of thousands of dollars to and for the benefit of the defendants to resolve insurance claims that were falsely inflated by the wrongful submissions detailed above.

311.   Allstate's damages seek monies paid directly to the defendants or on their behalf by Allstate, and the damages are not derivative of an injury to any other person or entity.  The patients at issue in this Complaint were used as pawns by the defendants and have been victimized and harmed by the defendants, as set out above, including being subject to layperson-controlled unlawful, unnecessary, and experimental treatment, paying deductibles and copayments to the defendants for unlawful and unnecessary treatment, and using up their limited PIP benefits on alleged treatment billed by the defendants.   However, the main target of the defendants' scheme—and the sole party that received fraudulent mailings and faxes as itemized in the exemplar patients above and in Exhibit 3—is Allstate.  Allstate alone paid the damages at issue herein.  Injury to Allstate was also the reasonably probable consequence of the defendants' actions, as it was in the ordinary course of the defendants' business to demand and collect insurance proceeds.

312.   The defendants' wrongful conduct discussed above caused Allstate to incur damages by paying claims that otherwise would not have been paid but for the

defendants' misrepresentations and improper conduct (as set out in the preceding sections). Allstate was the target of the defendants' conduct and bills, and Allstate's damages are directly related to and a consequence of the defendants' actions discussed herein.

313. Allstate also seeks damages, in an amount to be determined at trial, related to the costs of claims handling/adjustment for claims mailed and faxed by the defendants, which includes the cost of investigation to uncover the wrongful nature of the claims submitted by the defendants.

314. Allstate investigated each of the defendants both individually and in connection with the comprehensive scheme detailed herein and incurred investigative and claims handling expenses with respect to each defendant.

## XIV.  CAUSES OF ACTION

### COUNT I
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Ortiz Health Enterprise)
### Against Orline Joseph and Ricardo Bacallao, D.C.

315. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 314 set forth above as if fully set forth herein.

316. Ortiz Health constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

317. In connection with each of the claims identified in the within Complaint, defendants Joseph and Bacallao ("Count I defendants") intentionally

caused to be prepared and mailed/faxed false medical documentation by or on behalf of Ortiz Health, or knew that such false medical documentation would be mailed/faxed in the ordinary course of Ortiz Health's business, or should have reasonably foreseen that the mailing/faxing of such false medical documentation by or on behalf of Ortiz Health would occur, in furtherance of the Count I defendants' scheme to defraud.

318. The Count I defendants knew or should have foreseen that two (2) or more mailings/faxes would be sent to demand and receive payment from Allstate on certain dates, including those mailings/faxes identified in the chart annexed hereto at Exhibit 3.

319. As documented above, the Count I defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Ortiz Health, which they knew would be billed by Ortiz Health and submitted to Allstate by Ortiz Health in order to collect payment from Allstate.

320. Joseph owned, operated, and controlled Ortiz Health and was responsible for all actions taken by Ortiz Health and its representatives.

321. Bacallao purported to render treatment to patients of Ortiz Health and was instrumental in the preparation of the fraudulent records submitted to Allstate.

322.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to Ortiz Health for the benefit of the Count I defendants that would not otherwise have been paid.

323.   The Count I defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

324.   By virtue of the Count I defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT II
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Ortiz Health Enterprise)
### Against Orline Joseph and Ricardo Bacallao, D.C.

325.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 314 set forth above as if fully set forth herein.

326.   Defendants Joseph and Bacallao ("Count II defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Ortiz Health.

327.   The Count II defendants each agreed to further, facilitate, support, and operate the Ortiz Health enterprise.

328.   As such, the Count II defendants conspired to violate 18 U.S.C. § 1962(c).

329.   The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Ortiz Health even though Ortiz Health was not eligible to collect such payments by virtue of its unlawful and wrongful conduct.

330.   The Count II defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

331.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count II defendants' unlawful conduct described herein.

332.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count II defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count II defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

<u>COUNT III</u>
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Align Enterprise)**
**Against Ortiz Health and Rehab Center, Inc.; Orline Joseph; and Ricardo**
**Bacallao, D.C.**

333.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 314 set forth above as if fully set forth herein.

334.   Align constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

335.   In connection with each of the claims identified in the within Complaint, defendants Ortiz Health, Joseph, and Bacallao ("Count III defendants") intentionally caused to be prepared and mailed/faxed false medical documentation by or on behalf of Align, or knew that such false medical documentation would be mailed/faxed in the ordinary course of Align's business, or should have reasonably foreseen that the mailing/faxing of such false medical documentation by or on behalf of Align would occur, in furtherance of the Count III defendants' scheme to defraud.

336.   The Count III defendants knew or should have foreseen that two (2) or more mailings/faxes would be sent to demand and receive payment from Allstate on certain dates, including those mailings/faxes identified in the chart annexed hereto at Exhibit 3.

337.   As documented above, the Count III defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would

be submitted to Allstate for medical services that were purportedly performed by Align, which they knew would be billed by Align and submitted to Allstate by Align in order to collect payment from Allstate.

338.   Joseph owned, operated, and controlled Align and was responsible for all actions taken by Align and its representatives.

339.   Bacallao purported to serve as Align's owner, which was necessary to create the (false) appearance of lawfulness of the bills and records submitted by Align, and was responsible for preparing the fraudulent records submitted to Allstate.

340.   Align operated as a continuation of Ortiz Health's business, including by submitting bills using Ortiz Health's letterhead and continuing courses of treatment initiated by Ortiz Health, both of which allowed Align and its associates to continue pursuing payment from Allstate.

341.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to Align for the benefit of the Count III defendants that would not otherwise have been paid.

342.   The Count III defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

343.   By virtue of the Count III defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

<u>**COUNT IV**</u>
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Align Enterprise)**
**Against Ortiz Health and Rehab Center, Inc.; Orline Joseph; and Ricardo Bacallao, D.C.**

344.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 314 set forth above as if fully set forth herein.

345.   Defendants Ortiz Health, Joseph, and Bacallao ("Count IV defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Align.

346.   The Count IV defendants each agreed to further, facilitate, support, and operate the Align enterprise.

347.   As such, the Count IV defendants conspired to violate 18 U.S.C. § 1962(c).

348.   The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Align even though Align was not eligible to collect such payments by virtue of its unlawful and wrongful conduct.

349.   The Count IV defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

350.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count IV defendants' unlawful conduct described herein.

351.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count IV defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count IV defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT V**
**VIOLATION OF Fla. Stat. § 772.103(3)**
**(Ortiz Health Enterprise)**
**Against Orline Joseph and Ricardo Bacallao, D.C.**

352.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 314 set forth above as if fully set forth herein.

353.   Ortiz Health constitutes an enterprise, as defined in Fla. Stat. § 772.103(3).

354.   In connection with each of the claims identified in the within Complaint, defendants Joseph and Bacallao ("Count V defendants") intentionally

caused to be prepared and mailed/faxed false medical documentation by Ortiz Health, and knew that such false medical documentation would be mailed/faxed in the ordinary course of Ortiz Health's business, or should have reasonably foreseen that the mailing/faxing of such false medical documentation by or on behalf of Ortiz Health would occur, in furtherance of the Count V defendants' scheme to defraud.

355.  As documented above, the Count V defendants repeatedly and intentionally submitted, caused to be submitted, and knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Ortiz Health, which they knew would be billed by Ortiz Health and submitted to Allstate by Ortiz Health in order to collect payment from Allstate.

356.  Joseph owned, operated, and controlled Ortiz Health and was responsible for all actions taken by Ortiz Health and its representatives.

357.  Bacallao purported to render treatment to patients of Ortiz Health and was instrumental in the preparation of the fraudulent records submitted to Allstate.

358.  The Count V defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Ortiz Health to continue billing for unlawful and medically unnecessary treatment, as well as treatment that was not rendered at all.

359.   These knowing and intentional acts constitute a pattern of criminal activity, and said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

360.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to Ortiz Health for the benefit of the Count V defendants that would not otherwise have been paid.

361.   The Count V defendants' conduct in violation of Fla. Stat. § 772.103(3) was the direct and proximate cause of Allstate's injury.

362.   By virtue of the Count V defendants' violation of Fla. Stat. § 772.103(3), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them together with costs of suit, including reasonable attorney's fees and court costs pursuant to Fla. Stat. § 772.104.

**<u>COUNT VI</u>**
**VIOLATION OF Fla. Stat. § 772.103(4)**
**(Ortiz Health Enterprise)**
**Against Orline Joseph and Ricardo Bacallao, D.C.**

363.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 314 set forth above as if fully set forth herein.

364. Defendants Joseph and Bacallao ("Count VI defendants") conspired with each other to violate Fla. Stat. § 772.103(3) through the facilitation of the operation of Ortiz Health.

365. The Count VI defendants each agreed to further, facilitate, support, and operate the Ortiz Health enterprise.

366. As such, the Count VI defendants conspired to violate Fla. Stat. § 772.103(3).

367. The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Ortiz Health even though Ortiz Health was not eligible to collect such payments by virtue of its unlawful and wrongful conduct.

368. The Count VI defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations in violation of Fla. Stat. § 817.234(1)(a).

369. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count VI defendants' unlawful conduct described herein.

370. By virtue of the Count VI defendants' violation of Fla. Stat. § 772.103(3), Allstate is entitled to recover from them threefold the actual damages sustained by reason of the claims submitted, caused to be submitted, or known to be

submitted by them, and others acting in concert with them, together with reasonable attorney's fees and court costs pursuant to Fla. Stat. § 772.104.

**COUNT VII**
**VIOLATION OF Fla. Stat. § 772.103(3)**
**(Align Enterprise)**
**Against Ortiz Health and Rehab Center, Inc.; Orline Joseph; and Ricardo Bacallao, D.C.**

371.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 314 set forth above as if fully set forth herein.

372.   Allied constitutes an enterprise, as defined in Fla. Stat. § 772.103(3).

373.   In connection with each of the claims identified in the within Complaint, defendants Ortiz Health, Joseph, and Bacallao ("Count VII defendants") intentionally caused to be prepared and mailed/faxed false medical documentation by or on behalf of Align, and knew that such false medical documentation would be mailed/faxed in the ordinary course of Align's business, or should have reasonably foreseen that the mailing/faxing of such false medical documentation by or on behalf of Align would occur, in furtherance of the Count VII defendants' scheme to defraud.

374.   As documented above, the Count VII defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Align, which they knew would be billed by Align and submitted to Allstate by Align in order to collect payment from Allstate.

375.    Joseph owned, operated, and controlled Align and was responsible for all actions taken by Align and its representatives.

376.    Bacallao purported to serve as Align's owner, which was necessary to create the (false) appearance of lawfulness of the bills and records submitted by Align, and was responsible for preparing the fraudulent records submitted to Allstate.

377.    Align operated as a continuation of Ortiz Health's business, including by submitting bills using Ortiz Health's letterhead and continuing courses of treatment initiated by Ortiz Health, both of which allowed Align and its associates to continue pursuing payment from Allstate.

378.    The Count VII defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Align to continue submitting bills for unlawful and medically unnecessary treatment, if provided at all.

379.    These knowing and intentional acts constitute a pattern of criminal activity, and said acts constitute insurance fraud in violation of Fla. Stat. § 817.234(1)(a).

380.    As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued

payment drafts to Align for the benefit of the Count VII defendants that would not otherwise have been paid.

381.  The Count VII defendants' conduct in violation of Fla. Stat. § 772.103(3) was the direct and proximate cause of Allstate's injury.

382.  By virtue of the Count VII defendants' violation of Fla. Stat. § 772.103(3), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees and court costs pursuant to Fla. Stat. § 772.104.

**COUNT VIII**
**VIOLATION OF Fla. Stat. § 772.103(4)**
**(Align Enterprise)**
**Against Ortiz Health and Rehab Center, Inc.; Orline Joseph; and Ricardo Bacallao, D.C.**

383.  Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 314 set forth above as if fully set forth herein.

384.  Defendants Ortiz Health, Joseph, and Bacallao ("Count VIII defendants") conspired with each other to violate Fla. Stat. § 772.103(3) through the facilitation of the operation of Align.

385.  The Count VIII defendants each agreed to further, facilitate, support, and operate the Align enterprise.

386.    As such, the Count VIII defendants conspired to violate Fla. Stat. §
772.103(3).

387.    The purpose of the conspiracy was to obtain insurance payments from
Allstate on behalf of Align even though Align was not eligible to collect such
payments by virtue of its unlawful and wrongful conduct.

388.    The Count VIII defendants were aware of this purpose and agreed to
take steps to meet the conspiracy's objectives, including the creation and submission
to Allstate of insurance claim and medical record documents containing material
misrepresentations in violation of Fla. Stat. § 817.234(1)(a).

389.    Allstate has been injured in its business and property by reason of this
conspiratorial conduct whereas Allstate has been induced to make insurance
payments as a result of the Count VIII defendants' unlawful conduct described
herein.

390.    By virtue of the Count VIII defendants' violation of Fla. Stat. §
772.103(3), Allstate is entitled to recover from them threefold the actual damages
sustained by reason of the claims submitted, caused to be submitted, or known to be
submitted by them, and others acting in concert with them, together with reasonable
attorney's fees and court costs pursuant to Fla. Stat. § 772.104.

## COUNT IX
### VIOLATIONS OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (Fla. Stat. §§ 501.201-501.213)
### Against All Defendants

391.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 314 set forth above as if fully set forth herein.

392.   Defendants Ortiz Health, Align, Joseph, and Bacallao ("Count IX defendants") engaged in unfair and deceptive acts and practices in the conduct of trade and commerce in violation of FDUTPA in relation to each insurance claim at issue herein. *See* Fla. Stat. §§ 501.201-501.213.

393.   The Count IX defendants' deceptive acts and practices included knowingly billing for purported services that were unlawful and unlicensed, that they did not perform, that were a result of improper patient referrals, that were falsely supported by falsified and fabricated records, and that were medically unnecessary, and concealing the same from Allstate and their patients, all of which constitute false, incomplete, and misleading statements made while "knowing that such statement contains any false, incomplete, or misleading information concerning any fact or thing material to such claim" in violation of the Florida Insurance Fraud Statute. Fla. Stat. § 817.234(1)(a)(1).

394.   The Count IX defendants' deceptive acts and practices injured Allstate in its business and property because Allstate paid money and insurance benefits in response to bills and medical records submitted by the Count IX defendants that

were improper for the reasons set out in this Complaint (including that the alleged treatment billed was not actually performed, that the purported treatment was experimental and not necessary, and that the alleged treatment was not appropriately billed in accordance with applicable laws, licensure requirements, and guidelines).

395.   The Count IX defendants' deceptive acts and practices also harmed patients, who were consumers subjected to unnecessary and experimental treatment that was actually controlled by an unqualified layperson and who were not given truthful information to make their own healthcare decisions.

396.   Knowingly causing to be presented to any insurer a false claim for payment is expressly an unfair or deceptive act or practice pursuant to Fla. Stat. § 626.9541(1)(u).

397.   The defendants' violations of Fla. Stat. § 817.234 and Fla. Stat. § 626.9541 are *per se* violations of the FDUTPA.

398.   Accordingly, the defendants' conduct is *per se* unfair or deceptive under FDUTPA.  *See* Fla. Stat. § 501.204(1).

399.   The defendants' above-described conduct was deceptive as it was likely to, and did in fact, mislead the defendants' patients and Allstate, while acting reasonably under the circumstances, to Allstate's detriment by misrepresenting the fact, lawfulness, and medical necessity of the charges.

400.   The defendants' above-described conduct was unfair as it was contrary to public policy, unconscionable, immoral, unethical, oppressive, and unscrupulous, and produced no benefits to consumers or competition and in fact harmed the defendants' patients.

401.   As a result of the defendants' deceptive and unfair practices, patients were harmed and Allstate has been injured in its business and property and the defendants are liable to Allstate for damages and an award of attorney's fees pursuant to Fla. Stat. § 501.2105(1).

**COUNT X**
**COMMON LAW FRAUD**
**Against All Defendants**

402.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 314 set forth above as if fully set forth herein.

403.   The scheme to defraud perpetrated by Ortiz Health, Align, Joseph, and Bacallao ("Count X defendants") was dependent upon a succession of material misrepresentations of fact that the defendants were actually and lawfully rendering medically necessary treatment and services and were entitled to collect payments from Allstate.

404.   The misrepresentations of fact made by the Count X defendants include those material misrepresentations discussed in section XI.A, *supra*.

405.   The Count X defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

406.   The misrepresentations were intentionally made by the Count X defendants in furtherance of their scheme to defraud Allstate by submitting, causing to be submitted, or knowing that non-compensable insurance claims for payment would be submitted to Allstate.

407.   The Count X defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that are not compensable under federal and Florida law.

408.   Allstate reasonably relied upon such material misrepresentations to its detriment in paying numerous non-meritorious bills for alleged medical expenses pursuant to insurance claims and incurring expenses related to the adjustment and processing of insurance claims submitted by and on behalf of the defendants.

409.   As a direct and proximate result of the defendants' fraudulent representations and acts, Allstate has been damaged in its business and property as previously described herein.

**COUNT XI**
**CIVIL CONSPIRACY**
**Against All Defendants**

410.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 314 set forth above as if fully set forth herein.

411.   Defendants Ortiz Health, Align, Joseph, and Bacallao ("Count XI defendants") combined and acted in concert to accomplish the unlawful purpose of defrauding Allstate by submitting claims for payment to which they were not entitled because (1) the defendants did not actually render the treatment for which insurance claims were submitted, (2) the defendants did not provide reasonably necessary medical treatment, (3) the defendants did not lawfully render treatment, and (4) the defendants engaged in fraudulent billing practices, as described above.

412.   The Count XI defendants worked together to achieve an unlawful purpose (namely, defrauding Allstate for personal gain).

413.   This purpose was known to all of the Count XI defendants and intentionally pursued.

414.   Despite knowing that the defendants were not entitled to payment because they billed for services that were not actually provided, because they billed for services that were not reasonably necessary, because treatment was not lawfully rendered, and because they engaged in fraudulent billing practices, the Count XI defendants nonetheless submitted, caused to be submitted, or knew that claims would be submitted (with accompanying false medical documentation) to Allstate seeking payment.

415.   In reasonable reliance on and as a result of the false medical documentation submitted by the defendants, Allstate paid certain of the insurance claims submitted.

416.   All of the Count XI defendants directly benefited from the payments made to Ortiz Health and Align.

417.   All of the Count XI defendants actively and intentionally partook in a scheme to defraud Allstate and also encouraged and aided other Count XI defendants in the commission of acts done for the benefit of all Count XI defendants and to the unjustified detriment of Allstate.

418.   Accordingly, all of the Count XI defendants are equally liable for the fraud perpetrated on Allstate by each other defendant pursuant to their conspiracy.

**COUNT XII**
**AIDING AND ABETTING**
**Against All Defendants**

419.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 314 set forth above as if fully set forth herein.

420.    Defendants Ortiz Health, Align, Joseph, and Bacallao ("Count XII defendants") each knowingly aided and abetted the scheme to defraud Allstate.

421.   Despite knowing that the defendants were not entitled to payment because they billed for services that were not actually provided, because they billed for services that were not reasonably necessary, because treatment was not lawfully

78

rendered, and because they engaged in fraudulent billing practices, the Count XII defendants nonetheless submitted, caused to be submitted, or knew that claims would be submitted (with accompanying false medical documentation) to Allstate seeking payment.

422.   The conduct of the Count XII defendants in substantially advancing the fraudulent scheme was material and necessary to the success of the Count XII defendants' fraudulent scheme.

423.   The Count XII defendants aided and abetted the fraudulent scheme in a calculated effort to induce Allstate into paying the Count XII defendants' fraudulent and unlawful charges.

424.   All of the Count XII defendants actively and intentionally partook in a scheme to defraud Allstate and also encouraged and aided other Count XII defendants in the commission of acts done for the benefit of all Count XII defendants and to the unjustified detriment of Allstate.

425.   Accordingly, all of the Count XII defendants are equally liable for the fraud perpetrated on Allstate pursuant to their conduct in substantially advancing the wrongful scheme.

## COUNT XIII
## UNJUST ENRICHMENT
### Against All Defendants

426.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 314 set forth above as if fully set forth herein.

427.   Defendants Ortiz Health, Align, Joseph, and Bacallao ("Count XIII defendants") submitted, caused to be submitted, or benefited from insurance claims submitted to Allstate that caused Allstate to pay money, in reasonable belief that it was legally obligated to make such payments based upon the defendants' misrepresentations.

428.   Allstate's payments constitute a benefit that the Count XIII defendants aggressively sought and voluntarily accepted.

429.   The Count XIII defendants wrongfully obtained or benefited from payments from Allstate through the scheme detailed herein.

430.   The Count XIII defendants' retention of these payments would violate fundamental principles of justice, equity, and good conscience.

## COUNT XIV
## DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
### Against All Defendants

431.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 314 set forth above as if fully set forth herein.

432.   Defendants Ortiz Health, Align, Joseph, and Bacallao ("Count XIV defendants") routinely billed for unnecessary and unlawful services with respect to the patients at issue in this Complaint.

433.   The Count XIV defendants also billed for services not rendered.

434.   The Count XIV defendants also billed for services pursuant to a scheme whereby patients were subjected to a predetermined treatment protocol for the purpose of generating insurance claims to Allstate, and not for the purpose of providing reasonably necessary medical treatment, testing, or services.

435.   Pursuant to Florida law, Allstate is liable to pay PIP benefits only for "reasonable expenses for medically necessary medical, surgical, x-ray, dental, and rehabilitative services related to injuries caused by motor vehicle accidents up to the applicable cap of either $2,500 or $10,000," Fla. Stat. § 627.736(1)(a), and to pay other claims only for reasonably necessary, causally related, and lawful services.

436.   Where a claimant and/or assignee is unable to show that an expense has been incurred for a reasonably necessary product or service arising out of an accident, there can be no finding of a breach of the insurer's duty to pay, and thus no finding of liability with regard to that expense.

437.   The Count XIV defendants continue to submit and cause to be submitted claims for unnecessary and unlawfully rendered medical services to Allstate, and other claims remain pending with Allstate.

438.   The Count XIV defendants will continue to submit and cause to be submitted claims to Allstate absent a declaration by this Court that Allstate has no obligation to pay pending and previously-denied insurance claims submitted by any of the Count XIV defendants.

439.   Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XIV defendants billed for unnecessary and unlawful treatment that is not compensable.

440.   Allstate also requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XIV defendants were engaged in a scheme whereby they billed for unnecessary and unlawful treatment and submitted unreasonable charges for the same to Allstate at all relevant times.

441.   As such, the Count XIV defendants have no standing to submit, pursue, or receive benefits or any other payment from Allstate, and Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XIV defendants cannot seek payment from Allstate for benefits under any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the wrongful conduct detailed in the within Complaint.

442.   Allstate further requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XIV defendants cannot

balance bill or otherwise seek payment from any person insured under an Allstate policy or for whom Allstate is the responsible payor related to the wrongful conduct detailed in the within Complaint.

**XV.    DEMAND FOR RELIEF**

WHEREFORE, plaintiffs Allstate Insurance Company, Allstate Property and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Fire and Casualty Insurance Company respectfully pray that judgment enter in their favor as follows:

**COUNT I**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Ortiz Health Enterprise)**
**Against Orline Joseph and Ricardo Bacallao, D.C.**

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT II
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Ortiz Health Enterprise)
### Against Orline Joseph and Ricardo Bacallao, D.C.

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT III
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Align Enterprise)
### Against Ortiz Health and Rehab Center, Inc.; Orline Joseph; and Ricardo Bacallao, D.C.

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT IV
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Align Enterprise)
## Against Ortiz Health and Rehab Center, Inc.; Orline Joseph; and Ricardo Bacallao, D.C.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT V
## VIOLATION OF Fla. Stat. § 772.103(3)
### (Ortiz Health Enterprise)
## Against Orline Joseph and Ricardo Bacallao, D.C.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to Fla. Stat. § 772.104, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VI
### VIOLATION OF Fla. Stat. § 772.103(4)
### (Ortiz Health Enterprise)
### Against Orline Joseph and Ricardo Bacallao, D.C.

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to Fla. Stat. § 772.104, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT VII
### VIOLATION OF Fla. Stat. § 772.103(3)
### (Align Enterprise)
### Against Ortiz Health and Rehab Center, Inc.; Orline Joseph; and Ricardo Bacallao, D.C.

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to Fla. Stat. § 772.104, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT VIII
## VIOLATION OF Fla. Stat. § 772.103(4)
### (Align Enterprise)
### Against Ortiz Health and Rehab Center, Inc.; Orline Joseph; and Ricardo Bacallao, D.C.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to Fla. Stat. § 772.104, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT IX
## VIOLATIONS OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (Fla. Stat. §§ 501.201-501.213)
### Against All Defendants

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate all damages pursuant to Fla. Stat. §§ 501.201-501.213, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the deceptive and unfair conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT X
## COMMON LAW FRAUD
### Against All Defendants

(a)    AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)    AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)    GRANT all other relief this Court deems just.

## COUNT XI
## CIVIL CONSPIRACY
### Against All Defendants

(a)    AWARD Allstate its actual and consequential damages against the defendants, jointly and severally, in an amount to be determined at trial;

(b)    AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)    GRANT all other relief this Court deems just.

## COUNT XII
## AIDING AND ABETTING
### Against All Defendants

(a)    AWARD Allstate its actual and consequential damages against the defendants, jointly and severally, in an amount to be determined at trial;

(b)    AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' wrongful conduct; and

(c)      GRANT all other relief this Court deems just.

## COUNT XIII
## UNJUST ENRICHMENT
### Against All Defendants

(a)      AWARD Allstate its actual and consequential damages in an amount to be determined at trial; and

(b)      GRANT all other relief this Court deems just.

## COUNT XIV
## DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
### Against All Defendants

(a)      DECLARE that Allstate has no obligation to pay pending and previously-denied insurance claims submitted by Ortiz Health and Rehab Center, Inc., Align to Shine Chiropractic LLC, Orline Joseph, and Ricardo Bacallao, D.C., jointly and severally, for any or all of the reasons set out in the within Complaint;

(b)      DECLARE that Ortiz Health and Rehab Center, Inc., Align to Shine Chiropractic LLC, Orline Joseph, and Ricardo Bacallao, D.C., jointly and severally, cannot seek payment from Allstate pursuant to any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the wrongful conduct detailed in the within Complaint;

(c)      DECLARE that Ortiz Health and Rehab Center, Inc., Align to Shine Chiropractic LLC, Orline Joseph, and Ricardo Bacallao, D.C., jointly and severally, cannot balance bill or otherwise seek payment from any person insured under an

Allstate policy or for whom Allstate is the responsible payor related to the wrongful conduct detailed in the within Complaint; and

(d)    GRANT such other relief as this Court deems just and appropriate under Florida law and the principles of equity.

## XVI.  **DEMAND FOR JURY TRIAL**

The plaintiffs hereby demand a trial by jury on all claims.

Respectfully submitted:

*/s/ Andrew H. DeNinno*

_____
Andrew H. DeNinno (FBN 1061324)
adeninno@ktmpc.com
KTM
350 Granite Street, Suite 2204
Braintree, MA 02184
(617) 770-2214 (phone)

*Lead Counsel for Plaintiffs Allstate*

Dated: August 15, 2025